# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| DERRICK GRAY, YOLANDA GRAY,<br>Amir Gray, a minor, DERRICK GRAY,<br>a minor, and Atia Gray, a minor,<br>by their next friend, YOLANDA GRAY,<br><br>     Plaintiffs,<br><br>     v.<br><br>CITY OF HAMMOND, INDIANA,<br>SGT. PATRICK VICARI,<br>CPL. KARL EIDAM, CITY OF<br>CALUMET CITY, and<br>SGT. KEVIN URBANEK,<br><br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>Cause No.: 2:08-CV-114-TS |

## OPINION AND ORDER

This matter is before the court on the Motion for Summary Judgment filed by Defendants

City of Hammond, Indiana, Sergeant Patrick Vicari (Vicari), and Corporal Karl Eidam (Eidam)

[DE 38].[1] In support of their Motion, the Defendants filed a Brief in Support [DE 39] and a

Supplemental Brief [DE 46]. The Plaintiffs filed a Memorandum in Opposition to the Motion

[DE 48] and an Appendix [DE 49]. The Defendants also filed a Reply Brief [DE 50]. The Court

has carefully considered all of the briefs and supporting exhibits submitted by the parties. For the

reasons discussed below, the Defendants' Motion is GRANTED in part and DENIED in part.

Summary judgment is GRANTED to Defendant City of Hammond on all claims asserted against

it; summary judgment is GRANTED to Defendants Vicari and Eidam on all claims asserted

against them in their official capacity; summary judgment is GRANTED to Defendants Vicari

---

[1] Defendants City of Calumet City and Sergeant Kevin Urbanek did not join in the Motion or file
a separate motion.

and Eidam on all of the Plaintiffs' Fourth Amendment claims related to the initial traffic stop of their vehicle; summary judgment is GRANTED as to Derrick Gray's and Yolanda Gray's claims of malicious prosecution; summary judgment is GRANTED to Defendants Vicari and Eidam on all claims asserted against them by Atia Gray; summary judgment is GRANTED to Defendants Vicari and Eidam on all claims asserted against them by Amir Gray; summary judgment is DENIED as to Derrick Gray's and Yolanda Gray's claims of excessive force and claims of unreasonable search and seizure; summary judgment is DENIED as to Derrick Gray, Jr.'s, claim of excessive force; and summary judgment is DENIED as to Defendants Vicari's and Eidam's defense of qualified immunity.

## FACTUAL BACKGROUND

Derrick and Yolanda Gray, who are husband and wife, initiated this lawsuit on April 14, 2008, on behalf of themselves and their minor children. (Compl., DE 1.) They filed an Amended Complaint on June 25, 2008 [DE 19] and it is this Amended Complaint that now controls the case.[2] In their Amended Complaint, the Plaintiffs allege that the City of Hammond, Indiana, and the City of Calumet City, Illinois, are liable to the Gray family for violations of their First, Fourth, and Fourteenth Amendment rights (Count I). More specifically, the Plaintiffs contend that the City Defendants failed to "properly hire, adequately supervise, and train" their police officers. (*Id.* ¶ 2.) Defendants Vicari and Eidam are police officers employed by the city of Hammond, and Defendant Urbanek is a police officer employed by the City of Calumet City. (*Id.*

---

[2] The Amended Complaint differs from the original only in its addition of the City of Calumet City as a Defendant.

¶ 1.) In addition to suing the municipalities, the Grays are suing Officers Vicari, Eidam, and Urbanek for false arrest and battery (Count II), excessive force (Count III), and abuse of process and malicious prosecution (Count IV). The Amended Complaint (like the original Complaint) does not indicate whether they are suing the three police officers in their individual capacities, their official capacities, or both. But more on this later. The Grays bring their claims via 42 U.S.C. §§ 1983 and 1988.

The violations alleged by the Plaintiffs arose out of events that occurred on July 7, 2006, in Hammond. In their Amended Complaint, the Plaintiffs allege that they were in their car, and had just backed out of their driveway, when the Defendant officers "stopped the Gray's vehicle 200 yards from their home and pointed their guns at everyone in the car and ordered everyone out of the car." (*Id.* ¶¶ 8–9.) The Plaintiffs insist that they "were lawfully engaged in constitutionally protected activity and had committed no crime and therefore were stopped even though the police had no probable cause." (*Id.* ¶ 10.) The Amended Complaint states that the officers surrounded the Plaintiffs' vehicle and never asked them to produce identification, or otherwise attempted to learn their identity. The Plaintiffs maintain that "Mr. and Mrs. Gray did not resist or become disorderly, and they consistent with their First Amendment rights repeatedly asked what they had done to warrant their being stopped." (*Id.* ¶ 13.) The Plaintiffs contend that officers then pointed their firearms at one of their children, who was fourteen years old at the time, and ordered him out of the vehicle. Mrs. Gray then exited the vehicle after being directed to do so by the officers and was "violently tackled" by Defendant Vicari, "handcuffed, battered, and manhandled." (*Id.* ¶ 14.) When the Grays' seventeen-year-old son got out of the vehicle and asked why his mother was being "dragged on the ground," they allege that he was forced to the

ground in "a chokehold" and held on the ground "with a gun put to his head." (*Id*.) The Amended Complaint makes no factual assertions concerning any physical altercation between Mr. Gray and any of the officers, although such assertions are made in the Plaintiffs' Response and Memorandum in Opposition to the Motion for Summary Judgment. Those allegations, and other details provided by the parties, will be discussed below as they become relevant to the Court's analysis.

In Count IV of the Amended Complaint, the Plaintiffs contend that some time after the events of July 7, 2006, Defendants Vicari, Eidam and Urbanek "did intentionally abuse the legal process and maliciously prosecute the Plaintiffs, Derrick Gray and Yolanda Gray." (*Id*. ¶ 24.) The Plaintiffs allege that "as a result of the actions of the Defendants [Mr. and Mrs. Gray] were criminally charged[.]" but that they "were acquitted at trial on March 29, 2007." (*Id*. ¶¶ 25–26.) By way of their lawsuit, the Plaintiffs seek compensatory damages in the amount of $5 million for physical and emotional injuries suffered by all members of their family.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-

moving party. *See id.* at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *id.,* 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.,* 209 F.3d 687, 692 (7th Cir. 2000).

Summary judgment is not a substitute for a trial on the merits nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enters., Inc. v. First Chi. Corp.,* 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg,* 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *See Celotex,* 477 U.S. at 322; *Ziliak v. AstraZeneca LP,* 324 F.3d 518, 520 (7th Cir. 2003). A failure to prove one essential element "necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 323.

The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. *Celotex,* 477 U.S. at 325. A plaintiff's self-serving statements, which are speculative or which lack a foundation of personal knowledge, and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment. *Albiero v. City of Kankakee,* 246 F.3d 927, 933 (7th Cir. 2001); *Stagman v. Ryan,* 176 F.3d 986, 995 (7th Cir. 1999); *Slowiak v. Land O'Lakes, Inc.,* 987 F.2d 1293, 1295 (7th

Cir. 1993).

## DISCUSSION

In their Motion for Summary Judgment, the Defendants, not surprisingly, present a very different version of the events of July 7, 2006, and contend that none of the individual officers' actions violated the Plaintiffs' constitutional rights. The Defendants also argue that the City of Hammond cannot be held liable for any of the Plaintiffs' alleged constitutional violations since they cannot establish that the City had in place a policy or procedure that resulted in any of the alleged violations of their constitutional rights. Vicari and Eidam also argue that they are entitled to judgment as a matter of law on the Plaintiffs' claims of malicious prosecution and/or abuse of process. In the alternative, Vicari and Eidam argue that they are entitled to qualified immunity.[3]

In their Brief in Support and their Supplemental Brief, the Defendants provide statements of material fact that offer a more detailed account of the events on the night in question. According to the Defendants, "[a] home invasion and a shooting occurred in Calumet City, Illinois." (Br. in Supp. 5.) The Hammond Police Department issued a radio dispatch that

_____

[3] The Plaintiffs have also alleged that the Defendants violated their First Amendment rights. (Am. Compl. ¶ 3.) The Plaintiffs state that "consistent with their First Amendment rights [they] repeatedly asked what they had done to warrant their being stopped." (*Id.* ¶ 13.) Because the Grays never got a response to this question and were subsequently arrested (without probable cause, according to them), the police somehow violated their First Amendment rights to freedom of speech. This is a dubious claim under the circumstances and the Plaintiffs offer no additional factual detail to help explain how their First Amendment rights were violated. *See Kokkinis v. Ivkovich*, 185 F.3d 840, 843 (7th Cir. 1999) (stating that a claim under § 1983 for retaliation in violation of the First Amendment requires that the plaintiff's speech be constitutionally protected and, if so, that the defendants' actions be motivated by the plaintiff's protected speech). However, the Defendants do not move for summary judgment on any First Amendment claims, and the only mention of it by the Plaintiffs is to note that they "have a First Amendment right to free speech." (Pls.' Resp. 9.) Because neither party discusses the First Amendment claim in any detail, the Court will not render any ruling on its merits within the summary judgment context.

included a description of a vehicle allegedly involved in the crime. (*Id*.) Shortly thereafter, Eidam observed a vehicle matching that description and pulled it over. (*Id*.) He noticed a passenger in the vehicle with his feet hanging out the window, and discovered that the passenger had been shot. (*Id*.)  (The victim later died. *Id*.) The driver of the vehicle fled on foot and while he was doing so, Officer Eidam "observed him conceal something." (*Id*.) Eidam did not pursue the fleeing suspect because he was concerned with tending to the wounded passenger. (*Id*.) Instead, Eidam relayed the situation to dispatch and police quickly "set up a perimeter to prevent the driver from escaping." (*Id*.) The Defendants explain that "[t]he purpose of the perimeter was to prevent any suspicious vehicles from leaving the area. The police had no way of knowing whether someone else had come to pick the man up or whether the man had forced someone to come help him escape." (*Id*.) Eidam then received a radio call from Officer Miller "who held a position on the perimeter. Officer Miller informed Eidam a vehicle was pulling out of the area where the suspect was last seen and that the vehicle should probably be stopped, which is what Eidam did." (*Id*.) This vehicle belonged to the Plaintiffs. The police executed a "felony stop" of the Plaintiffs' vehicle, which "calls for heightened security in view of the increased risk of harm to the officers." (*Id.* 5.) The Defendants explained that their purpose in stopping the Gray's vehicle was to determine whether the suspect was inside." (*Id*. 5–6.) Police wanted to ensure that the suspect was not "hiding in the rear seats of the plaintiffs' SUV. Accordingly, the police ordered the plaintiffs to exit their vehicle." (*Id*. 6.) Because the SUV had tinted windows, police could not see inside and could not determine how many people were in the vehicle or who they were. (*Id*.) According to the Defendants, the "plaintiffs disobeyed the orders and refused to exit the vehicle. Several minutes passed. This created even greater suspicion." (*Id*.)

The Defendants state that Mrs. Gray finally exited the vehicle "but she did not do so in a compliant fashion. She became loud and boisterous and tried to run away. At this point, Mrs. Gray had been noncompliant with police commands and, furthermore, was guilty of resisting arrest as a result of her attempt to flee." (*Id*.) Vicari, who was also on the scene, "physically seized Mrs. Gray and brought her to the ground in order to control her and prevent her from running out into traffic. When Mr. Gray saw what had happened to his wife, he became noncompliant. He tried to break away from officers, which prompted them to seize him, place him over a vehicle and handcuff him." (*Id*.) The Defendants summarize their version of the events as follows:

> [T]he police acted reasonably in stopping plaintiff's vehicle. They had every reason to believe that the suspect was somehow connected to the plaintiffs. Their intention was to make a *Terry* investigative stop for the safety of all concerned, most particularly the people in the SUV. It was the plaintiffs' uncooperative conduct which aggravated the situation. The Grays committed the misdemeanors of "resisting arrest" and "disorderly conduct" in the presence of the police officers, thereby providing them with probable cause to arrest them and have them charged with those offenses. The police treatment of the plaintiffs was reasonable and not excessive.

(*Id*.) Eidam testified in his deposition that he believed the police "'had a reasonable suspicion to stop the vehicle to conduct an investigation not only for the safety of the area residents but for the Grays as well at that point to determine if an individual was in the vehicle possibly harming them or they were removing a subject from the perimeter area.'" (*Id*. 3 (quoting Eidam Dep,, Defs.' Ex. 6, p. 17).)[4] Based on this version of the facts, the Defendants argue that the Plaintiffs' constitutional rights were not violated.

---

[4] For purposes of consistency and ease of reference, all page numbers cited by the Court in this Opinion and Order are the page numbers assigned to various documents by the court's electronic docketing system, and appear at the upper right hand portion of each page. These page numbers may or may not coincide with the page numbers originally placed on those documents by the parties.

**A.      Claims Against the City of Hammond**

In their Amended Complaint, the Plaintiffs seek compensatory damages from the City of Hammond "for failure to properly hire, adequately supervise, and train their agents," whose actions "led to the constitutional deprivations, physical injuries, illegal arrest, illegal search, illegal seizure and emotional distress suffered by the Plaintiffs." (Pls.'Am. Compl. ¶ 2.) This is the only allegation levied against the City of Hammond.

It is well established that a municipality cannot be held liable under a *respondeat superior* theory for constitutional violations committed by its employees. *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).  Municipalities can only be held liable for such violations if "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury."  *Id*. at 694. If a municipality has no written or otherwise expressly stated policy that allegedly caused a plaintiff's deprivation of rights, then plaintiff can demonstrate such a policy by proving that the municipality had "a wide-spread practice that . . . is so permanent and well settled [that it] constitute[s] a custom or usage with the force of law."  *McTigue v. City of Chi.*, 60 F.3d 381, 382 (7th Cir. 1995)).[5]

The City of Hammond argues that "[p]laintiffs have neither been [able] to locate or point to any express unconstitutional policy of the city nor have they revealed a well-established unconstitutional practice or custom. . . . Furthermore, plaintiffs have failed to establish a causal

---

[5] A municipality can also be liable under § 1983 if "the constitutional injury was caused by a person with 'final decision policymaking authority.'" *McTigue*, 60 F.3d at 382.  In the present case, the Plaintiffs do not argue that the City of Hammond is liable under this alternative theory.

relationship between such nonexistent policy and the plaintiff['s] alleged injuries. . . . [W]hile four depositions of police officers were taken, not a single question was asked of them regarding the existence of an unconstitutional policy." (Defs.' Br. in Supp. 10.) Finally, the City points out that even assuming the acts of Eidam and/or Vicari are deemed unconstitutional, the Supreme Court has expressly held that "'[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*'" (*Id*. (quoting *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985)). Furthermore, as to the Plaintiffs' allegations that the City of Hammond is liable for having failed to train Vicari and Eidam properly, the Defendants point out that "'[i]n Indiana, police officer training is governed by state law.'" (*Id*. 9 (quoting *Tapia v. City of Greenwood*, 965 F.2d 336, 339 (7th Cir. 1992)). The Defendants argue that "[p]ursuant to state law, the Hammond Police Officers were trained at the Indiana Law Enforcement Academy and have also received annual continuing training mandated by the state." (*Id*.) Therefore, the City of Hammond cannot be held liable under the theory that it failed to train the two officers properly, and that failure resulted in constitutional injuries. (*Id*.) The City also cites *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989), in support of its argument that it cannot be held liable on a "failure to train" theory. (*Id*. 11.) In *Harris*, the Supreme Court held that "[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under §1983." *Harris*, 489 U.S. at 389. The Defendants maintain, therefore, that are no facts in the record to support the Plaintiffs' theory that the City of Hammond has unconstitutional policies, procedures, or practices in place that led to a violation of the Plaintiffs' rights.

The Plaintiffs respond to the City's summary judgment arguments by presenting evidence

that six other individuals have filed civil rights lawsuits against the City of Hammond between 2005 and 2007 (some alleging excessive force). The Plaintiffs argue that, based on their interaction with the police and the allegations in the other lawsuits, "a reasonable jury could conclude that the City of Hammond has a custom and policy which allows its police officers to use excessive force and to violate the constitutional rights of citizens." (Pls.' Resp. 8.) This argument requires a substantial leap in logic, and is not supported by case law.

The Defendants challenge the relevance and probity of the prior lawsuits. The Defendants state that "plaintiffs ask the Court to conclude that there was a policy or custom of police abuse based upon the fact that six people filed complaints, out of hundreds of thousands of people who have had contacts with the police." (Defs.' Reply 2.) The Defendants argue that evidence of other lawsuits against a law enforcement agency are insufficient, in and of themselves, to prove (or raise a fact issue about) a city or police department was deliberately indifferent to a known problem. (*Id*.) In support of their position, the Defendants cite several cases addressing this very issue. (*Id*.) For example, in *Jenkins v. Bartlett*, 487 F.3d 482 (7th Cir. 2007), the court held that the plaintiff's reference to four other instances of shootings of citizens by police officers was not sufficient to establish that the defendant failed to train its officers properly. The Seventh Circuit held that "[t]his is not enough to provide the city or [police Chief] with actual or constructive knowledge that 'the police . . . so often violate constitutional rights that the need for further training must have been plainly obvious.'" *Jenkins*, 487 F.3d at 493 (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989)). The Defendants cite several other cases that also addressed the issue of prior claims or prior lawsuits against a city and/or its police department. (Defs.' Reply, p. 2.) These cases include: *Waslewski v. Kato*, 1993 WL 8761

* 4 (N.D. Ill. Jan. 14, 1993) ("reference to past court cases against police officers for misconduct is too general to be of evidentiary worth in establishing a specific pattern of conduct required to support a section 1983 claim."); *Estate of Moreland v. Dieter*, 395 F.3d 747, 760 (7th Cir. 2005) (three prior incidents of improper use of pepper spray insufficient to prove widespread practice of abuse); and *Palmer v. Marion County*, 327 F.3d 588, 595 (7th Cir. 2003) (evidence of two incidents were insufficient to establish that policy or custom existed). The Defendants summarize their argument on this point as follows:

> Of the six lawsuits [referenced by the Grays], four are pending and two were disposed of without any finding of fault by the police. . . . [P]laintiffs have failed to point to a single instance which should have alerted the Chief or the Mayor to a problem within the department, let alone suggest that they were deliberately indifferent to a problem. . . . The incidents plaintiffs referred to are random and unrelated. By and large, they involve different officers and different sets of circumstances. They share little in common other than someone busted for a crime who claims that the police harmed him. It is not uncommon for captured criminals to complain about their treatment at the hands of the police, the F.B.I. and all other law enforcement officials.

(Defs.' Reply 2–3.)[6]

The Defendants' arguments are well taken. The Plaintiffs draw broad conclusions from the fact that other lawsuits were filed, including that, "[a]pparently the City of Hammond took no steps to control its officers," and that it has a policy of "maintain[ing] officers on the Hammond Police force who consistently use excessive force or violate the constitutional rights of citizens in the discharge of their duties." (Pls.' Resp. 8.) But such conclusions, lacking sufficient competent evidence to support them, are insufficient to avoid summary judgment. A court's

---

[6] The Court notes that only one of the six case cited by the Plaintiffs involved any of the Defendants named in this case—that being the case of *Stancato v. City of Hammond, et al.*, 2:07-CV-259 (N.D. Ind., Hammond Division), which named Officer Vicari as one of several defendants.

"favor toward the nonmoving party does not extend to drawing '[i]nferences that are supported by only speculation or conjecture.'" *Singer v. Raemisch*, 2010 WL 252290 *3 (7th Cir. Jan. 25, 2010) (quoting *McDonald v. Vill. of Winnetka,* 371 F.3d 992, 1001 (7th Cir. 2004)). The evidence presented by the Plaintiffs is insufficient to establish (or even raise a genuine issue of material fact) that the City of Hammond acted with indifference toward the rights of its citizens or failed to act in the face of actual or constructive notice that such failure would likely result in constitutional deprivations. *See Ross v. Town of Austin, Ind.*, 343 F.3d 915, 918 (7th Cir. 2003) (deliberate indifference standard applicable to claims against municipal entities for failure to train). The Plaintiffs have not designated facts from which a reasonable jury could find that the existence of a policy, procedure, or custom on the part of the City of Hammond resulted in the deprivation of any of the Plaintiffs' constitutional rights. Were the Court to find otherwise on the strength of the evidence submitted by the Plaintiffs in this case, municipal liability would improperly collapse into *respondeat superior* liablity. *See Bd. of County Comm'n of Bryan County, Okla v. Brown*, 520 U.S. 397, 415 (1997) (noting that "Congress did not intend municipalities to be held liable unless *deliberate* action attributable to the municipality directly caused a deprivation of federal rights"). For these reasons, summary judgment is granted in favor of the City of Hammond.

**B.** **Official Capacity Claims Against Vicari and Eidam**

As the Court stated above, the Plaintiffs do not state whether they are suing Vicari and Eidam in their individual capacities, their official capacities, or both. If they intended both, their claims against the individual police officers in their official capacities would be the same as their

claims against the government entity that employs them. *Grieveson v. Anderson*, 538 F.3d 763, 771 (7th Cir. 2008). Because the Court has concluded that the Plaintiffs' claims against the City of Hammond fail for the reasons discussed above, any official capacity claims against the officers would likewise fail. Accordingly, to the extent such claims even exist in this lawsuit, summary judgment is granted in favor of Vicari and Eidam on the Plaintiffs' official capacity claims asserted (or intended to be asserted) against them.

**C.     Individual Capacity Claims Against Vicari and Eidam for Illegal Seizure**

The Defendants argue that they had a legitimate reason to stop the Plaintiffs' vehicle pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968). (Defs.' Br. 12.) They argue the following:

> The officers had a right to conduct a brief investigatory stop of the vehicle if they had reasonable suspicion based on articulable facts that a crime was about to be committed or had been committed. These officers knew that serious crimes had been committed, namely: home invasion and homicide. The question was whether the suspect was in the vehicle (the Grays' vehicle) which had just come from where the suspect was last seen. Under those circumstances a reasonably prudent person would be warranted in the belief that the occupants of that vehicle or other members of the public, including the police, were in danger as a result of the fleeing suspect.

(*Id.*) According to the deposition testimony of the officers involved, Officer Rachel Miller, who was in the vicinity, made a radio call that a light-colored SUV "was backing out of an area where the suspect was last seen and was requesting that the vehicle be stopped." (*Id.* 3.) Miller testified in her deposition that she saw "a vehicle leaving the area from where we were–had established a perimeter and I asked if officers were able to stop it because I did not have a squad car." (*Id.*, Ex. 4, Miller Dep., p. 2.) Eidam stated in his deposition that he heard Miller's radio call and proceeded to stop the Grays' vehicle. (*Id.*, Ex. 6, Eidam Dep., pp. 11–12.)

14

The Plaintiffs argue that, despite all of this, the police were wrong to stop their vehicle and violated their Fourth Amendment rights when they did so because none of the factors cited to support the stop provide probable cause or reasonable suspicion that "the Grays had committed or were about to commit a crime." (Pls.' Resp. 11); (*id.* 10 (arguing that "none of the Plaintiffs were suspects. . . . None of the Plaintiffs were described as a suspect in the shooting").)[7] But the Plaintiffs' argument ignore the fact that what the officers were attempting to ascertain—whether the Plaintiffs were willingly or unwillingly transporting the suspect—was supported by specific and articulable facts and the rational inferences from those facts.

*Terry*, of course, allows police to initiate an investigatory stop when the officer has reasonable suspicion that a crime may be afoot. 392 U.S. at 30. To conduct a *Terry* stop, an officer must be "aware of specific and articulable facts giving rise to reasonable suspicion." *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir. 1994). Reasonable suspicion is more than a hunch but less than probable cause and "considerably less than preponderance of the evidence." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). It requires "some minimal level of objective justification for making a stop." *United States v. Sokolow*, 490 U.S. 1, 7 (1989). Determining whether an officer had a reasonable suspicion is assessed considering "the totality of circumstances," and "common-sensical judgments and inference about human behavior." *United States v. Baskin*, 401 F.3d 788, 791 (7th Cir. 2005).

Even if no specific facts suggested that the Plaintiffs were the perpetrators of the home

---

[7] Regarding the initial traffic stop, the Plaintiffs devote much of their brief to a discussion of probable cause. They point out that Eidam, both in his deposition and at the state court trial of Derrick and Yolanda Gray, "admitted that no probable cause existed to stop the Grays." (Pls.' Resp., p. 6.) However, police do not need probable cause to initiate an investigatory traffic stop. Rather, they only need reasonable suspicion that a crime may be afoot. *Terry*, 392 U.S. 1. The Court, therefore, examines the issue of the stop of the Grays' vehicle under the reasonable suspicion standard enunciated in *Terry*.

invasion, the totality of circumstances known to the officers would warrant a person of reasonable caution in the belief that stopping the vehicle and its unknown passengers was appropriate and reasonable to respond to the ongoing threat to public safety posed by the fleeing gunman. It is undisputed that police knew that a home invasion and shooting had occurred and that a suspect was at large, that a perimeter had been quickly established in an attempt to locate the suspect, and that Officer Miller saw a vehicle within that perimeter and in an area where the fleeing suspect was last seen.[8] Reasonable inferences about human behavior would suggest to the police that the suspect might try to hide in a vehicle within the perimeter to try to escape. Although the driver of any such vehicle could very well be an innocent (meaning uninvolved) bystander who was simply in the wrong place at the wrong time, some level of individual privacy can be sacrificed before the intrusion becomes unreasonable. The "Fourth Amendment's reasonableness requirement strikes a balance between an individual's interest in being left alone and the public's interest in community safety, crime control, and the safety of law enforcement officers engaged in the work of protecting the public and investigating crime."*United States v. Jennings*, 544 F.3d 815, 819 (7th Cir. 2008) (finding that officers' interest in maintaining control

---

[8] The Plaintiffs attempt to create a genuine issue of material fact regarding Officer Miller's observations. They argue that because Officer Miller admitted at the Plaintiffs' trial that she never saw the suspect herself, a reasonable jury could conclude that she was lying about spotting the suspect, that the suspect was never in the vicinity of the Plaintiffs' vehicle, and that the Defendants contrived the story to cover up their actions with regard to the Plaintiffs. However, Officer Miller never purported to see the suspect herself, and the Defendants do not rely on such a fact. She learned through other officers where the suspect might be, and was "standing there because we had set up a perimeter because the last known location of the suspect was in that area." (Miller Dep., p. 2.) When law enforcement officers are in communication regarding a suspect, the knowledge of one officer can be imputed to the other officers under the collective knowledge doctrine. *United States v. Hensley*, 469 U.S. 221, 231–33 (1985); *United States v. Lenoir*, 318 F.3d 725, 728 (7th Cir. 2003). Thus, the fact that Officer Miller did not personally see the suspect does not create a genuine issue of material fact regarding the scope of the perimeter or where the suspect was last seen.

inside their secure perimeter until a SWAT team secured an apartment that was targeted for a search outweighed an individual's interest in being left alone for the few minutes that he was detained). Eidam initiated a traffic stop of the Plaintiffs' vehicle for purposes of investigating whether that vehicle was in any way involved with the serious crime that had just been committed, particularly whether the suspect was inside. According to both Eidam and Vicari, the Grays did not immediately comply with police commands, thereby increasing the officers' level of suspicion. The Plaintiffs present no evidence to refute the officers' version of the facts and circumstances that led up to the initial traffic stop.

The undisputed evidence shows that the Defendants had reasonable suspicion under the circumstances to initiate a traffic stop of the Plaintiffs' vehicle within the perimeter. Therefore, Vicari and Eidam are entitled to summary judgment on the Plaintiffs' claims that their Fourth Amendment rights were violated when their vehicle was stopped and they were seized.


**D.      Individual Capacity Claims Against Vicari and Eidam for Excessive Force**

The parties present two very different recitations of what transpired after the Defendants stopped the Plaintiff's vehicle. The Plaintiffs contend they did nothing wrong, were compliant with the officers' orders, and were nonetheless wrongfully stopped and detained, and subjected to unnecessary physical force. The officers contend that the Plaintiffs were not compliant and that only the minimal physical force appropriate under the circumstances was used. The officers maintain that they were reacting quickly and reasonably in an attempt to locate a dangerous suspect in a serious shooting incident.

A claim that a police officer has used excessive force in the course of an arrest,

investigatory stop, or other "seizure" of a citizen is addressed to the reasonableness of the seizure, under the standards established by the Fourth Amendment. *Graham v. Connor,* 490 U.S. 386, 395 (1989); *Abdullahi v. City of Madison,* 423 F.3d 763, 768 (7th Cir. 2005). The reasonableness inquiry involves a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham,* 490 U.S. at 396 (internal quotation marks omitted). Courts must give "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* The reasonableness inquiry must allow for the fact that "police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

In the present case, the rather stark difference between the Plaintiffs' and the Defendants' versions of events raises credibility issues. The task of ascertaining who is telling the truth, choosing between competing inferences, and balancing the relative weight of conflicting evidence about the events of July 7, 2006, belongs to a jury. It is well established that "'the district court cannot weigh credibility issues at the summary judgment stage.'" *AutoZone, Inc. v. Strick*, 543 F.3d 923, 934 (7th Cir. 2008) (quoting *Stuart v. Quaker Oats Co.*, 978 F.2d 947, 963 (7th Cir. 1992)); *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) ("As we have said many times, summary judgment cannot be used to resolve swearing contests between litigants."). For the most part, the factual disputes and credibility issues preclude summary judgment on the Plaintiffs' claims for violations of their Fourth Amendment rights based on the reasonableness of

the force used during their detention and arrest. However, because not all of the family members were treated in the same manner or were arrested, each of the Plaintiff's claim must be examined individually.

1.    *Claim of Yolanda Gray*

The credibility issues that exist in this case with regard to Plaintiff Yolanda Gray's claims are highlighted by a comparison of the deposition testimony of the parties. Vicari and Eidam both testified that any physical force used against the Plaintiffs was necessary and appropriate. Vicari, for example, testified as follows:

> Q. . . . How far away from [Mrs. Gray] were you when you went to tackle her?
> A.  Maybe 25 to 30 feet.
> Q.  Okay.  And did you walk toward her to tackle her, or did you take off running?
> A.  I ran.
> Q.  Okay.  Any reason you tackled her as opposed to just grabbing her?
> A.  I wanted to secure her down on the ground, because I did not know what was going on.
> . . .
> Q.  Okay.  And your testimony is she just took off running toward Hohman Avenue?
> A.  Yes.
> Q.  And then you had to tackle her for what reason?
> A.  To secure her.
> Q.  Okay.  And you were in fear for her safety at the time you tackled her to the ground?
> A.  Yes.
> . . .
> Q.  Did you do an affidavit of probable cause to have criminal charges filed against [Mrs. Gray]?
> A.  Yes.
> Q.  And what charges were those?
> A.  Resisting law enforcement and I believe disorderly conduct.
> Q.  What did she do to resist law enforcemen
> A.  She refused to obey the commands of Corporal Eidam.
> Q.  What did she do that you considered to be disorderly conduct?

A. Created a tumultuous conduct in a situation that could have been handled much better.
Q. Why don't you explain what specifically you mean by tumultuous conduct.
A. By refusing the orders of Corporal Eidam, by exiting the vehicle against his commands, by yelling and screaming.

(Defs.' Br. in Supp., Ex. 3, Vicari Dep., pp. 5–6, 8.) Vicari also testified that the only injuries

Mrs. Gray sustained when he tackled her were some abrasions, most likely on her knees. (*Id.*, p.

7.) In contrast, Mrs. Gray testified as follows:

Q. How many steps would you say you took [after exiting the Grays' vehicle]?
A. I would say maybe five steps out of the vehicle before I was on the ground.
. . .
Q. What were you screaming about?
A. I was screaming for someone to get my baby because she was hysterical . . . and I wanted to let the officers know that there is a young child in the car.
. . .
Q. And you continued to scream until were tackled?
A. No, I actually only said that a few times, but then when I was tackled I went–I came to, because I blacked out from the tackle . . . when he hit me, he knocked me out of my sandals. I had on some slip-on sandals, and my hairpiece went off . . .
. . .
Q. Would you say that you were walking away from–were you walking away from the scene?
A. I was walking to the police officers and cars that were parked, police cars.
Q. So you would not say you were walking away?
A. No, to walk away would have been to go nowhere, because we were surrounded by police.

(Pls.' App., Ex. C, Yolanda Gray Dep., pp. 5–8.) So, while Vicari testified that Mrs. Gray got out

of her vehicle screaming and yelling, refused to obey commands, and took off running, Mrs.

Gray testified that she was only yelling for someone to tend to her youngest child, that she

wanted to alert police to the child's presence in the vehicle, that she was walking toward the

police—not running away from them—when she exited her vehicle, and that she had only taken a few steps before Vicari tackled her. Mrs. Gray also stated that the force of Vicari's tackle knocked her out of her sandals and caused her hairpiece to fly off of her head.

Officer Urbanek testified as follows:

Q. . . . Did you ever see Mrs. Gray get out of the SUV?
A. Yes, I did.
Q. And what did you see her do?
A. I seen her run from the passenger side out into the lane of traffic on Hohman Avenue with her hands up.
. . .
Q. Did everything you observed the Hammond officers doing that day comport with proper procedure in your mind?
A. Yes.
Q. Did you think the tackling of Yolanda Gray was or was not excessive force?
A. I believe it was not excessive force.

(Defs.' Br. in Supp., Ex. 4, Urbanek Dep., pp. 5, 7.) Mr. and Mrs. Gray's children also had their depositions taken in this case. Atia Gray testified as follows:

Q. When did you start getting really angry, not angry, but upset?

A. When I first saw the police officer with the gun I started crying because I was scared. So then my mom got out of the car, and they told her to go in front of the car, so she walked to the front of the car, and then a police officer come out of nowhere, tackled her, and then my brother got out of the car, and there was like a police officer over there, and my brother was trying to ask them why was they doing this and stuff, but one of the police officers like put him in a headlock and started to like choke him, and they had a gun to his head.

(Defs.' Supplemental Br., Ex. 3, Atia Gray Dep., pp. 2–3.) Mr. Gray also stated in his deposition that his wife was walking toward a squad car with her back to Vicari when Vicari "took off on a full run and just jumped on her back." (Pls.' App., Ex. 3, pp. 10, 11.)

These excerpts from deposition testimony evidence the parties' contrasting versions of the events giving rise to this lawsuit, and the material disputes of fact that require a trial on Mrs.

Gray's claim that Defendant Vicari's use of force was not objectively reasonable in light of the facts and circumstances of the situation.

**2.**      ***Claim of Derrick Gray, Sr.***

Vicari and Eidam argue that they are entitled to summary judgment on the excessive force claims of Mr. Gray because "all of the operative actions" against Mr. Gray and his son "were taken by a Calumet City officer [Urbanek]," and therefore neither Vicari nor Eidam are liable for any claims of excessive force. (Defs.' Reply 4.)

Mr. Gray did identify Urbanek as the officer who placed in him in the handcuffs (Pls.' App., Derrick Gray Dep., p. 6), which he contends were too tight. Section 1983 liability is based on personal responsibility and predicated on fault, *Hildebrandt v. Ill. Dep't of Nat'l Res.* 347 F.3d 1014, 1039 (7th Cir. 2003), and neither Vicari nor Eidam can be liable for the actions of Urbanek. However, Mr. Gray also testified that "all of a sudden out of nowhere Eidam comes and jumps on my back and presses my face down on the hood of the car, and he says I am taking you to jail for resisting, and I am taking your kids to family services." (Pls.' App., Derrick Gray Dep., p. 14.) Mr. Gray also claims that Eidam pushed his face down on the hood of a patrol car and burned his face, although he conceded that he did not seek medical treatment for those burns. (*Id*., p. 15.) The Defendants argue that Eidam let Gray up "in seconds" and that Gray "did not complain about his face or head." (Defs.' Reply 4.) Therefore, according to the Defendants, Mr. Gray has no excessive force claim against Eidam. However, given the discrepancies in the stories related by all the individuals involved, including Mr. Gray's contention that he was compliant with all officer commands, there are genuine issues of material fact for a jury to

decide, including whether Mr. Gray posed an immediate threat to the safety of the officers or others, and whether he was actively resisting officers. A jury may also consider the fact that Mr. Gray never sought treatment as a result of having his face pushed onto the hood of a police car in weighing the reasonableness of Eidam's actions (and, if appropriate, in determining the extent of any damages). But it is not a fact that precludes his claim. The Seventh Circuit has never adopted the physical injury requirement for claims of excessive force.

> Plaintiffs need not show physical injury in order to sustain an excessive force claim. Such a rule would be inconsistent with the Supreme Court's ruling in *California v. Hodari D.*, 499 U.S. 621 (1991), recognizing that an arrest can be effectuated by the slightest application of physical force, or by some other show of authority. *Id.* at 625. The issue is simply whether, once it is clear (as it is here) that a seizure has occurred, that seizure meets Fourth Amendment standards.

*Baird v. Renbarger*, 576 F.3d 340, 344 (7th Cir. 2009) (parallel citations omitted); *cf. Wilkins v. Gaddy*, — S. Ct. —, 2010 WL 596513, at *3 (Feb. 22, 2010) (finding in the Eighth Amendment excessive force context that the nature of the force and not the extent of the injuries is the controlling factor because "[i]njury and force . . . are only imperfectly correlated, and it is the latter that ultimately counts").

### 3.     *Claim of Amir Gray*

Amir Gray stated in his deposition that he had exited his family's vehicle and was talking calmly to the Hammond officers when Urbanek "came up behind me like this, and then he choked me to the ground to where I had no more breath in my lungs, and you know, I thought he was going to suffocate me." (Defs.' Supplemental Br., Ex. D, Amir Gray Dep., p. 6.) At no point in his deposition did Amir allege that either Vicari or Eidam used any physical force against him, and there is no claim that he was arrested or imprisoned.

Because there is no evidence in the record to support any claim that Vicari or Eidam violated any of Amir Gray's constitutional rights, they are entitled to summary judgment in their favor on any claims asserted against them by Amir Gray.

4.      *Claim of Derrick Gray, Jr.*

According to the Defendants, "Derrick, Jr.'s claim, based upon his deposition testimony, amounts to him being ordered out of the vehicle, handcuffed and patted down.  He was pushed up against a police vehicle. . . . By being 'pushed,' he explained that the officer 'grabbed him, showed that he was there, and put me against the car even harder than it was.'  He claimed that 'it put pressure on me.  It hurt.' . . . He did not complain or say anything. . . . He received no treatment for any injuries." (Defs.' Supplement, pp. 1–2 (citing excerpts from Dep. of Derrick Gray, Jr., Ex. 2).  It is undisputed that Derrick Jr. was not arrested or charged with any offense. Accordingly, the Defendants argue, Derrick Jr. has no viable claim against Vicari or Eidam.

It is for a jury to determine whether Vicari's or Eidam's use of force upon Derrick Jr. was reasonable under the circumstances. As noted above, the fact that he did not seek medical treatment does not foreclose his claim. The Court cannot conclude, on the record before it, that Vicari or Eidam are entitled to summary judgment on Derrick Jr.'s excessive force claim.

5.      *Claim of Atia Gray*

The parties do not dispute that Atia Gray, the Grays' youngest child, was not physically accosted in any way by any police officer. She was never handcuffed and never arrested. Her deposition testimony confirms these facts. (*See* Defs.' Supplemental Br., Ex. 3, Dep. of Atia

Gray.) In their Response, the Plaintiffs present no argument, let alone any evidence, to support any claim by Atia Gray against Vicari or Eidam. The Plaintiffs do make several references to Atia being "hysterical" and "crying," but that is the extent of it. The Plaintiffs have not alleged that Atia (or any of the other Gray children, for that matter) has any independent claim for any alleged emotional injury she might have sustained as a result of this encounter with the Defendants. Consequently, the Defendants are entitled to summary judgment in their favor on any claims asserted against them by Atia Gray.[9]

### E. Abuse of Process and Malicious Prosecution Claims Against Vicari and Eidam

The Plaintiffs allege in their Amended Complaint that Vicari and Eidam (and Urbanek, but the claims against him are not at issue) falsely charged them (that is, Mr. and Mrs. Gray, since none of their children were charged with any crime) with disorderly conduct and resisting arrest. Both Mr. and Mrs. Gray went to trial on the charges, which were ultimately dismissed by the state trial court.[10] In Count IV of their Amended Complaint, the Plaintiffs maintain that they

---

[9] The Court has no reason to doubt that the entire incident giving rise to this lawsuit was traumatic for Atia Gray (who was only nine years old at the time) to witness. It may even be true, as plaintiffs assert, that Atia "suffered severe emotional distress[.]" as a result. (Am. Compl., p. 4.) However, the Plaintiffs did not include any claims–state or federal–that would provide a basis on which Atia could recover for those alleged emotional damages. For example, the Plaintiffs did not include claims for intentional or negligent infliction of emotional distress. (Plaintiffs do make mention of claims for "battery" in their Amended Complaint, although no such claim is asserted on behalf of Atia, whom the parties agree had no wrongful physical contact with any police officer.) Since the court concludes that none of the moving defendants violated any of Atia Gray's constitutional rights, she has no basis for an independent claim for emotional damages.

[10] The Grays state that they "were acquitted at trial on March 29, 2007." (Am. Compl. ¶ 26.) The Defendants maintain that rather than an acquittal, the charges against the Grays were dismissed because the state court found that the prosecutor "failed to present any evidence as to the identification of the defendant in this cause." (Defs.' Reply, Exs. 3 and 4.) Apparently the prosecutor failed to have prosecution witnesses properly identify Derrick, Sr. or Yolanda Gray during the course of the criminal proceedings. The court, therefore, granted the defense motions for judgment on the evidence. (*Id*.) But the

did nothing to warrant the charges and that the actions of Vicari and Eidam constituted "abuse [of] the legal process" and "malicious prosecution." (Pls.' Am. Compl., Count IV .)  The Grays contend that they "had to endure the emotional distress of criminal proceedings, injury to their reputation and the expense of their criminal defense." (*Id*. ¶ 29.) In Count III of the Amended Complaint (which otherwise appears to be the excessive force claim) the Plaintiffs state that "Vicari [and] Eidam . . . after having stopped the Plaintiffs without probable cause, did falsely arrest, falsely imprison, and maliciously prosecute the Plaintiffs, Derrick Gray and Yolanda Gray. . . . [T]he Defendants acted with reckless indifference to the Plaintiff's Constitutional Rights." (Pls.' Am. Compl., Count III.)

Vicari and Eidam contend that they are entitled to summary judgment on any claim of malicious prosecution for two reasons. First, they argue that any such claim is barred by the Indiana Tort Claims Act (ITCA), Indiana Code § 34-13-3-3(6). (Defs.' Br. 18.) Second, they claim that the decision whether to prosecute any person, and the ability to do so, belongs exclusively to the office of the County Prosecutor, not to police officers. (*Id*.) With regard to any other state claims, the Defendants invoke section (8) of the ITCA, which provides that "[a] governmental entity or an employee acting within the scope of the employee's employment is not liable if a loss results from the following: . . . (8) [t]he adoption and enforcement of or failure to adopt or enforce a law . . . unless the act of enforcement constitutes false arrest or false imprisonment."  I.C. § 34-13-3-3(8). The Defendants argue that since the Gray children "were neither arrested nor imprisoned by Hammond Police officers[.]" and since "Derrick Sr. . . . was taken into custody by Officer Urbanek of the Calumet City Police Department" both Vicari and

---

distinction between acquittal and dismissal is not relevant to the issues before the court.

Eidam are entitled to the protection of the Act and cannot be held liable to the Plaintiffs. (Defs.' Br. 18; Defs.' Reply 6.)

The Defendants assume that the Plaintiffs intended to assert their claims for malicious prosecution and abuse of process as state law claims. The Amended Complaint does not delineate which claims are federal constitutional claims and which are state law claims. The Plaintiffs, assuming that they intended to allege the malicious prosecution claim as a federal claim, also fail to identify the particular constitutional amendment that applies to such a claim. The Plaintiffs' Response in opposition to summary judgment does not help in this regard. The Plaintiffs do not develop any argument with respect to malicious prosecution as a distinct claim from false arrest. They do not present any facts to explain what the officers did after arresting them that deprived them of due process or any other rights protected by the Constitution. The only facts they present about what occurred post-arrest is that they were charged with resisting law enforcement and disorderly conduct and acquitted of those charges. They then conclude that "[t]here are still genuine issues of material fact in dispute if this District Court revisits the issue of probable cause related to whether Derrick and Yolanda Gray should have been charged with disorderly conduct and resisting law enforcement under Indiana law." (Pls.' Resp. 17–18.)

If the Plaintiffs intended to assert a federal constitutional claim, *Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001), controls. *Newsome* holds that there is no "constitutional right not to be prosecuted without probable cause." 256 F.3d at 750; *see also Bielanski v. County of Kane*, 550 F.3d 632, 638 (7th Cir. 2008) (noting the Seventh Circuit's "well-settled rule that the interest in not being prosecuted groundlessly is not an interest that the Fourth Amendment protects" (quotations omitted)). A plaintiff therefore may not state a § 1983 claim simply by

alleging that he was maliciously prosecuted. Instead, he must allege the violation of one of his constitutional rights, such as the right to a fair trial. *Id.* at 750–52; *see also Parish v. City of Chi.*, — F.3d —, 2009 WL 3739348, at *2 (7th Cir. Nov. 10, 2009) (rejecting the appellant's argument that a footnote in *Wallace v. Kato*, 549 U.S. 384, 390 n.2 (2007), required the Seventh Circuit to revisit its holding in *Newsome*). The Plaintiffs do not make such a claim in this case, and the Court will not address malicious prosecution as a separate claim under § 1983.

It appears that the Plaintiffs intended to pursue their malicious prosecution claim under state law, although they did not explicitly state this in their pleadings or in their briefs to this Court. The Defendants have also proceeded under the assumption that the Plaintiffs intended their malicious prosecution claim to be cognizable under state law. Under Indiana law, "[t]he elements of a malicious prosecution action are: (1) the defendant instituted or caused to be instituted an action against the plaintiff; (2) the defendant acted maliciously in so doing; (3) the defendant had no probable cause to institute the action; and (4) the original action was terminated in the plaintiff's favor." *Crosson v. Berry*, 829 N.E.2d 184, 189 (Ind. Ct. App. 2005). The Plaintiffs do not introduce any evidence that it was the named Defendants who caused an action to be instituted against them, or that they did so out of malice. In any event, the Indiana Tort Claims Act provides that governmental employees acting within the scope of their employment are not liable for a loss that results from "[t]he initiation of a judicial or an administrative proceeding." Ind. Code § 34-13-3-3(6); *see also Livingston v. Consol. City of Indianapolis*, 398 N.E.2d 1302 (Ind. Ct. App. 1979) (holding that this language of the ITCA confers immunity upon police officers in actions for malicious prosecutions). The Plaintiffs address the ITCA briefly, but only to say that it has no application because it exempts "false

arrests and false imprisonment from its coverage." (Pls.' Resp. 18.) This refers to a different

subsection of § 34-13–3-3, which provides immunity for a government employee "acting within

the scope of the employee's employment is not liable if the loss results from . . . the . . .

enforcement of . . . a law . . . unless the act of enforcement constitutes false arrest or false

imprisonment." Ind. Code § 34-13-3-3(8). The Plaintiffs' response does not address the specific

immunity that applies to claims for malicious prosecution, and the Court finds no reason not to

apply the immunity and grant summary judgment for the Defendants.

The Plaintiffs' Amended Complaint also refers to abuse of process, which, in Indiana,

> "requires a finding of misuse or misapplication of process for an end other than
> that which it was designed to accomplish. The purpose for which the process is
> used is the only thing of importance." *Display Fixtures Co. v. R.L. Hatcher, Inc.*,
> 438 N.E.2d 26, 31 (Ind. Ct. App.1982). As the U.S. Supreme Court noted in a
> case reviewing a claim brought under 42 U.S.C § 1983 by an Indiana inmate,
> "The gravamen of [abuse of process] is not the wrongfulness of the prosecution,
> but some extortionate perversion of lawfully initiated process to illegitimate
> ends." *Heck v. Humphrey*, 512 U.S. 477, 486 n. 5 (1994).

*Nat'l City Bank, Ind. v. Shortridge*, 689 N.E.2d 1248, 1252 (Ind. 1997) ( parallel citations

omitted); *see also Lindsay v. Jenkins*, 674 N.E. 2d 324, 326 (Ind. Ct. App. 1991) (stating that a

claim for abuse of process has two elements: "1) an ulterior purpose, and 2) a willful act in the

use of the process not proper in the regular conduct of the proceedings"). The Plaintiffs have not

presented any evidence pointing to willful acts of the Defendant officers that are not proper in

the normal prosecution of criminal matters, or to any ulterior motive. However, the Court need

not address the potential merits of such a claim, because the Court adopts the position that ITCA

immunity applies with "equal force of logic to claims for malicious prosecution and abuse of

process." *Norris v. Bd. of Educ. of Greenwood Cmty. Sch. Corp.*, 797 F. Supp. 1452, 1460 (S.D.

Ind. 1992); *see also Clifford v. Marion County Prosecuting Attorney*, 654 N.E.2d 805, 809 (Ind.

Ct. App. 1995) (holding that prosecutor was immune from claim that he harassed plaintiff in the pursuit of collection of child support payments and reasoning that, "[i]n view of the fact that the primary tort which arises from initiating legal proceedings necessarily includes the element of bad faith, the presence of bad faith cannot remove the conduct from the very protection envisioned by the [ITCA]). The Plaintiffs' claim arises from the allegation that criminal charges were initiated without probable cause. The Plaintiff's Amended Complaint does not separate the malicious prosecution claim from the abuse of process claim, both of which allege that the Defendants "cause[d] legal proceedings to be instituted against them." (Pls.' Am. Compl. ¶ 27.) Accordingly, summary judgment is appropriate on the abuse of process claim.[11]

**F.      Qualified Immunity Defense.**

The individual Defendants also argue in their motion for summary judgment that they are entitled to qualified immunity from the Plaintiffs' claims. Qualified immunity shields government employees from liability for civil damages arising from actions within the scope of their employment unless their conduct violated "clearly established . . .  constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982);

---

[11] Although the Court is aware that *sue sponte* granting of summary judgment warrants special caution and generally requires that the party against whom summary judgment is entered have notice and an opportunity to present its evidence, entry of summary judgment here is not purely *sua sponte*. The Defendants specifically argued that the Plaintiffs' state law claims were barred by the ITCA. Although they did not specifically mention abuse of process, the Plaintiffs themselves bundle this claim with their claim of malicious prosecution, which the Defendants did refer to. The Defendants also clearly ask that summary judgment be granted "on all issues" and the cause be dismissed "in its entirety." (Mot. for Summ. J. 1, DE 38.) That the Plaintiffs chose not to differentiate between claims does not mean that they were denied an opportunity to respond to any specific state law claims they may have been asserting. Moreover, because immunity applies, there are no facts that the Plaintiffs could designate that would create a genuine issue of material fact related to any state law claim for abuse of process.

*accord Thomas v. Ramos,* 130 F.3d 754, 763 (7th Cir. 1997). Qualified immunity is "*immunity from suit* rather than a mere defense to liability." *Mitchell v. Forsyth,* 472 U.S. 511, 526–27 (1985). A court analyzes a defendant's claim of qualified immunity by determining (1) whether the facts alleged, "[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a constitutional right"; and (2) whether the right was clearly established at the time of its alleged violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Stated differently, even if the court concludes that the defendant's alleged actions were improper to the point of being unconstitutional, the defendant is still entitled to qualified immunity unless the unconstitutionality of the actions was clearly established at the time of their occurrence. *Id.* Although the two-step sequence outlined in *Saucier* is often appropriate, a court may exercise discretion in deciding which prong of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case. *Pearson v. Callahan*, 129 S. Ct. 808 (2009).

In this case, examining the facts in a light most favorable to the Plaintiffs, their right to be free from unreasonable seizure was a clearly established right at the time of the incident. In fact, Vicari and Eidam do not argue otherwise. Rather, they assert that they had reasonable suspicion to stop the Plaintiffs' vehicle, that they had probable cause to arrest them for the offenses of resisting arrest and disorderly conduct, and that any force they used was reasonable under the circumstances. (Defs.' Br. 18 ("since the officers acted reasonably in their treatment of the plaintiffs, they are entitled to qualified immunity").) Assuming, however, that the Plaintiffs' version of events is true, as the Court is required to do at the summary judgment stage, Vicari and Eidam violated the Plaintiffs' clearly established rights when they used force against compliant citizens and arrested them without cause. Under these facts, Vicari and Eidam would

not be entitled to qualified immunity, and they are not entitled to summary judgment on the basis that qualified immunity applies to the Plaintiffs' claims.

**G.      False Arrest Claim**

The Plaintiffs allege in their Amended Complaint that they were "falsely arrest[ed]" in reckless disregard of their constitutional rights. (Pls.' Am. Compl. ¶¶ 19, 20.) Although the Defendants claim that the Plaintiffs committed the misdemeanors of resisting arrest and disorderly conduct in the presence of police officers (Defs.' Br. 6), they do not provide any analysis of a false arrest claim under the Fourth Amendment or specifically move for summary judgment on such a claim. Likewise, in their Response in opposition to summary judgment, the Plaintiffs do not address it as a separate claim.

"Where an arrest occurs without probable cause, the plaintiff may bring a claim for unreasonable seizure" under § 1983 and the Fourth Amendment. *Bentz v. City of Kendallville*, 577 F.3d 776, 779 (7th Cir. 2009) (citing *A.M. v. Butler*, 360 F.3d 787, 798 (7th Cir. 2004); *see also Ienco v. Angarone*, 429 F.3d 680, 683 (7th Cir. 2005) ("a false arrest is an unreasonable seizure prohibited by the Fourth Amendment"). Because the Defendants have not moved for summary judgment on the federal false arrest claim, and because the record contains genuine disputes regarding the actions of the Plaintiffs that the Defendants rely on to support their arrests for resisting and disorderly conduct, this claim remains pending.

**CONCLUSION**

For the reasons set forth above, the Motion for Summary Judgment [DE 38] is

GRANTED in part and DENIED in part. Summary judgment is GRANTED to Defendant City of Hammond on all claims asserted against it; summary judgment is GRANTED to Defendants Vicari and Eidam on all claims asserted against them in their official capacity; summary judgment is GRANTED to Defendants Vicari and Eidam on the Plaintiffs' Fourth Amendment claims related to the initial traffic stop of their vehicle; summary judgment is GRANTED to Defendants Vicari and Eidam on all claims asserted against them by Atia Gray; summary judgment is GRANTED to Defendants Vicari and Eidam on all claims asserted against them by Amir Gray; summary judgment is GRANTED to Defendants Vicari and Eidam on Derrick Gray's and Yolanda Gray's claims of malicious prosecution and/or abuse of process; summary judgment is DENIED as to Derrick Gray's claims of excessive force and unreasonable seizure against Eidam; summary judgment is DENIED as to Yolanda Gray's claim of excessive force and unreasonable seizure against Vicari; and summary judgment is DENIED as to Derrick Gray, Jr.'s, claim of excessive force against Eidam and Vicari.

SO ORDERED on March 4, 2010.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
FORT WAYNE DIVISION